# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**THERMO CREDIT, LLC,**

    **Plaintiff,**

v.

**DCA SERVICES, INC.,**

    **Defendant.**

Civil Action 2:15-cv-2610
Chief Judge Edmund A. Sargus, Jr.
Magistrate Judge Kimberly A. Jolson

## OPINION AND ORDER

This matter is before the Court on the parties' cross-motions for summary judgment. Defendant DCA Services, Inc. ("DCA" or "Defendant") has moved for summary judgment on all of Plaintiff Thermo Credit, LLC's ("Thermo Credit" or "Plaintiff") claims. (Def.'s Mot. for Summ. J., ECF No. 35.) Plaintiff, in turn, seeks summary judgment against Defendant on all claims. (Pl.'s Mot. for Summ. J., ECF No. 37.)

Also before the Court are two additional motions: Plaintiff's Opposed Motion for Leave to Amend its Complaint (ECF No. 30) and Plaintiff's Motion to Strike evidence filed by Defendant. (ECF No. 52.)

For the reasons that follow, Defendant's Motion for Summary Judgment is **GRANTED** (ECF No. 35), Plaintiff's Motion for Summary Judgment (ECF No. 37) is **DENIED**, Plaintiff's Motion to Amend is **DENIED**, and Plaintiff's Motion to Strike is **DENIED** as moot.

# I. FACTS

## A. Procedural Background

Plaintiff Thermo Credit brings this action under Ohio's Uniform Fraudulent Transfer Act, O.R.C. § 1336.01 *et seq.* against Defendant DCA based on the business relationship between DCA and Thermo Credit's debtor, Communications Options, Inc. and related entities, including its parent company Communication III, Inc. (collectively, "COI" or "Comm III"). DCA was a vendor of COI from February 2012 until COI filed for bankruptcy and went out of business in January of 2015. Thermo Credit was COI's primary secured lender during the entire relevant time period and had a valid and first security interest in and to all of COI's assets, including its cash and accounts.

Thermo Credit originally brings its claim against DCA under O.R.C. § 1336.04(B)(2) alleging that DCA's receipt of payments from COI constituted constructive fraudulent transfers. As a result of the alleged constructive fraudulent transfers, Thermo Credit seeks to avoid all payments COI made to DCA. (Compl. ¶ 1, ECF No. 1.) The parties have since brought cross-motions for summary judgment. (ECF Nos. 35, 37.) One month after completion of non-expert discovery, Plaintiff filed a Motion for Leave to Amend its Complaint. (ECF No. 30.) In its Motion to Amend, Thermo Credit seeks to add an additional claim for actual fraud under O.R.C. § 1336(A)(2). DCA opposes amendment.

## B. Factual background

This action involves three parties: (1) the debtor enterprise COI, (2) Thermo Credit, COI's primary secured lender, and (3) DCA, a telecommunication software development company that managed and operated COI, as well as providing other services, for a period of

about three years. Thermo Credit seeks to avoid payments made by COI to DCA during the relevant time period for constructive fraud.

1. **COI**

Communications Options III, Inc., Communications Options, Inc., and Telecom Ventures (collectively, "COI"), were full-service telecommunications providers serving business and residential customers. (*Id.*) Communications Options III, Inc. was the top-level entity and Communications Options, Inc. and Telecom Ventures, Inc. were its subsidiaries. (Swenson Dep. 21:24–22:02.) The entities' financial statements were consolidated and they operated as a consolidated business. (Pl.'s Mot. Summ. J. at 2.)

On May 20, 2013, COI filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. *In re: Communications Options, Inc.*, Case No. 13-5453, Stipulation and Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection [Rel. Doc. No. 6] attached as Def.'s Exhibit 3 at PAGEID #: 989–1006.) In the Stipulation and Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection, the Bankruptcy Court granted Thermo Credit first-priority liens and security interests in all of COI's assets as follows:

> As additional adequate protection, Thermo Credit is hereby granted, effective as of the Petition Date, valid, automatically-perfected, and unavoidable first-priority liens and security interests in and on all of the Debtor's and Debtor-in-Possession's assets . . . wherever located and whether not existing or hereafter acquired including, without limitation . . . Revenues, Post-Petition Revenues, all real, personal, tangible or intangible property of the Debtor's estate . . . any and all proceeds, products, *cash*, distributions, checks . . . and other cash equivalents now or hereafter received by the Debtor in respect to any of the foregoing items . . . .

(Def.'s Exhibit 3, PAGEID #: 996 ¶ V) (emphasis added.) Accordingly, as of May 20, 2013, Thermo Credit had a lien that encumbered all of COI's cash. (*See id.*)

## 2. COI and Thermo Credit's Relationship

On September 30, 2010, COI borrowed approximately $990,000 from Thermo Credit, pursuant to a Loan and Security Agreement. (Pl.'s Exhibit I-1, ECF No. 37-10.) During the bankruptcy proceedings, Thermo Credit also provided debtor-in-possession financing for COI. (Exhibit H-63.) Thermo Credit asserts that as of March 31, 2017, COI remains indebted to Thermo Credit for at least $362,514.83. (Pl.'s Mot. Summ. J. at 2.) Thermo Credit claims that COI's current debt is made up of $207,491.23 in principal and $155,023.60 in interest, as well as for attorney's fees associated with the prosecution of the instant matter. (*Id.*)

## 3. COI and DCA's Relationship

DCA is a "developer and operator of custom back office software, specifically billing applications, provisioning applications, and primarily for telecommunications companies." (Swenson Dep. 25:15–19.) DCA and COI had a two and a half year business relationship governed by several different written agreements. The various agreements changed the nature of the DCA's duties and involvement with COI.

### a. The Original MSA (February 2012–April 2012)

In February 2012, COI and DCA executed the Managed Services Agreement, effective February 28, 2012 ("Original MSA"). (Ex. A-120; Swenson Dep. 38:18–39:3.) Under the Original MSA, DCA agreed to appoint a Chief Restructuring Officer ("CRO") who was to "undertake the complete management and operation of the Business as defined herein." DCA also agreed to "have management control and responsibility for all assets, liabilities, customers, personnel, facilities, revenue and expenses related to the Business . . . ." (Pl.'s Exhibit 120, PAGEID #: 1424.) DCA's duties under the agreement included: setting employee compensation and benefits; hiring and firing of employees; opening/closing facilities and negotiating changes

4

to existing facilities; billing and collection from end users; management of activities and services; paying or settling accounts with vendors. (*Id.*) Jeff Swenson was appointed as the CRO.

For its services, the Original MSA provided that DCA would receive 40% of the "net profit generated by the Business" and that it would be entitled to an additional payment equal to "20% of the net improvement of the Business's Balance Sheet during the month." (*Id.*) In April 2012, Defendants alleged they discovered that some of the financial statements provided by COI to DCA before executing the Original MSA were inaccurate. (Swenson Dep. 72:4–12.) Swenson testified that upon discovering that the information DCA utilized to base its decision to enter the agreement was factually incorrect, DCA sought to leave the agreement. (Swenson Dep. 71:7–14.)

COI convinced DCA not to leave and agreed to pay a minimum monthly payment for DCA's services instead of a percentage. (Swenson Dep. 73:1–11.) Swenson testified that after communicating with COI DCA's desire to leave the agreement, COI "asked under what circumstances would you stay and continue to help us. I think they were fairly concerned that if we walked out the door, specifically if I walked out the door, that CenturyLink would proceed with turning their service off, and the agreement that we had with them – for a workout would go away." (*Id.*) After discussing internally, DCA decided it wanted a minimum monthly payment for services.

### b. The First Service Agreement (May 2012–September 2013)

Following the April 2012 conversations, DCA and COI entered into a new Service Agreement ("First Service Agreement") and later that same month, a Supplemental Agreement. (Pl.'s Exhibits 121, 122; Swenson Dep. 100:17–25;101:1–24, ECF No. 37-2.) Under the First

5

Service Agreement and Supplemental Agreement, COI agreed to pay DCA a $35,000 minimum monthly fee with the potential for DCA to earn more if the revenue-sharing formula resulted in a fee that exceeded the set minimum. (Swenson Dep. 79:22; 81:24–25; 82:1–7.) On February 1, 2013, DCA and COI executed Amendment One, under which DCA assumed additional responsibilities including the "provisioning, customer service, collections, carrier reconciliation, revenue assurance, and general administrative support" all functions "historically provided by COI's direct employees." (Pl.'s Exhibit A-123; Swenson Dep. 114:17–22.) Under Amendment One, the minimum monthly payment was raised to $55,000. (Pl.'s Exhibit A-123.)

On January 20, 2015, COI notified DCA of its intent to terminate the Second Service Agreement (entered into October 2013) and to shut down its operations. (Pl.'s Exhibit B-249.) In February 2015, Thermo Credit foreclosed its security interest in COI's tangible assets. (Pl.'s Exhibit D-7.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing

6

that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### III. DISCUSSION

Thermo Credit brought suit seeking to avoid payments from COI to DCA, alleging that DCA committed constructive fraud under the Ohio Uniform Fraudulent Transfer Act, O.R.C. § 1336.04(B)(2).

The Ohio Uniform Fraudulent Transfer Act ("UFTA"), Ohio Revised Code §§ 1336.01 *et seq.*, imputes fraud to the debtor, or in this case third party, when the statutory elements have been met. *Youngstown Osteopathic Hosp. Ass'n v. Pathways Ctr. for Geriatric Psychiatry Inc.*, 280 B.R. 400, 408 (Bankr. N.D. Ohio 2002). "Asset" under O.R.C. § 1336.01(B) is defined as "property of a debtor, but does not include . . . property to the extent it is encumbered by a valid lien." O.R.C. § 1336.01(B)(1). Transfer is defined to mean "every direct or indirect, absolute or conditional, and voluntary or involuntary method of disposing of or parting with an asset or an

interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." O.R.C. § 1336.01(L).

Ohio Revised Code § 1336.04(A)(2) permits claims for constructive fraud. "Constructive fraud may exist even when the debtor has no actual intent to hinder, delay, or defraud an existing or future creditor." *Youngstown Osteopathic Hos. Ass'n*, 280 B.R. at 409 (citing *Aristocrat Lakewood Nursing Home v. Mayne*, 133 Ohio App. 3d 651, 729 N.E.2d 768 (1999)). The constructive fraud provision of UFTA provides that transfers made for less than reasonably equivalent value may by avoided if the debtor was insolvent when the transfers were made or became insolvent as a result of the transfers. O.R.C. § 1336(A)(2)(a)(b).

Both parties move for summary judgment. (ECF Nos. 35, 37.) DCA contends that it is entitled to summary judgment because: (1) COI's payments to DCA were not "transfers of assets"; (2) COI received reasonably equivalent value for all payments; and (3) Thermo Credit waived any claims under UFTA. Thermo Credit similarly contends that it is entitled to summary judgment because COI transferred assets while insolvent and did not receive the reasonably equivalent value in exchange for the transfers. Due to the overlap in arguments the parties present, the cross-motions for summary judgment will be addressed together.

**A. Transfer of Assets**

At the core of this action, Thermo Credit alleges that the monthly payments from COI to DCA were fraudulent transfers of assets. DCA seeks summary judgment, arguing that the payments were not "transfers" under O.R.C. § 1336.01(L) because Thermo Credit had a lien on COI's cash and therefore COI's money cannot be considered an "asset" under 1336(B). As defined under O.R.C. § 1336.01(B), property is not considered an asset "to the extent it is encumbered by a valid lien." O.R.C. § 1336.01(B). DCA argues that Thermo Credit's secured

8

interest in COI encumbered COI's cash such that any payment made was not a transfer of an asset. (Def.'s Mot. Summ. J. at 6–7.) In response, Thermo Credit contends that it "implicitly released its liens to allow COI to make payments in the ordinary course of its business." (Pl.'s Resp. in Opp. at 12, ECF No. 44.) The Court agrees with Thermo Credit that DCA's argument fails to the extent DCA alleges that Thermo Credit had a lien on COI's cash as a result of being a secured creditor. Rather, DCA does not put forth evidence proving that Thermo Credit had a lien on COI's cash until May 20, 2013.

It is undisputed that at least from May 20, 2013, when COI filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, that Thermo Credit had a lien on COI's cash, and therefore payments made to DCA after that date were not "transfers" under O.R.C. § 1336.01(L). (Def.'s Exhibit 3 PAGEID #: 989–1006.) The Bankruptcy decision held that effective as of May 20, 2013, Thermo Credit had "valid, automatically-perfected, and unavoidable first-priority liens and security interests in and on all of the Debtor's and Debtor-in-Possession's assets . . . [including in] any and all proceeds, products, cash, . . . and other cash equivalents." (*Id.*) Accordingly, the relevant time period for any alleged fraudulent transfers to have taken place was from February 2012 until May 2013.

## B. Insolvency and Reasonably Equivalent Value

The next questions are whether COI was insolvent between February 2012 and May 2013, and whether COI received a reasonably equivalent value from DCA for the payments made.

### 1. Insolvency

Under the Ohio UFTA "[a] debtor is insolvent if the sum of the debts of the debtor is greater than all of the assets of the debtor at a fair valuation. [] A debtor who generally is not

9

paying his debts as they become due is presumed to be insolvent." O.R.C. § 1336.02(A)(1) and (2). "Insolvency is essentially a balance-sheet test." *Rieser v. Hayslip*, 343 B.R. 615, 647 (Bankr. S.D. Ohio 2006) (citing *Foreman v. Indus., Inc. v. Broadway Sand & gravel*, 59 B.R. 145, 149 (Bankr. S.D. Ohio 1986)).

In DCA's Motion for Summary Judgment, DCA does not dispute COI's insolvency during the applicable time period. However, in its Opposition to Thermo Credit's Motion for Summary Judgment, DCA disputes whether COI was insolvent during <u>all</u> relevant times as Thermo Credit contends. (Def.'s Resp. in Opp. at 15, ECF No. 46.) Under the balance sheet insolvency analysis, Thermo Credit's expert's, D. Lyndon James ("James"), report revealed that COI's expenses exceeded its revenues from February 2012 to October 2014, with the exception of December 2012. (Expert report at 8, ECF No. 37-6.) DCA does not provide evidence contradictingMr. James' expert report. (Def.'s Resp. in Opp. at 15–16.) The Court therefore finds that there is no genuine dispute of material fact that in applying the balance-sheet test, COI was insolvent during the applicable time period, from February 2012 until May 2013, except for December of 2012.

## 2. Reasonably Equivalent value

Once a plaintiff has established insolvency at the time of the transfers, it must establish by a preponderance of the evidence that the Debtor received less than reasonably equivalent value in exchange for the challenged transfers. O.R.C. § 1336.01(B). To determine whether a transfer is supported by reasonably equivalent value, "courts generally compare the value of property transferred with that which is received in exchange for the transfer" from the time the transfer took place. *Slone v. Lassiter*, 406 B.R. 778 (Bankr. S.D. Ohio 2009) (citing *Corzin v. Fordu*, 201 F.3d 693 (6th Cir. 1999)). Courts consider both direct and indirect benefits

exchanged between the parties. *Harker v. Center Motors, Inc.*, 246 B.R. 311, 313 (Bankr. S.D. Ohio 2000) ("Both direct and indirect benefits should be considered by the court in determining whether reasonably equivalent value has been received.") (citation omitted).

Thermo Credit defers to the the expert report of Scott Howsare to argue that COI did not receive a reasonably equivalent value for payments made to DCA. Mr. Howsare's methodology is a penny-for-penny mathematical calculation, which assumes that COI could have obtained services similar to DCA by a different provider for cheaper rates. (Pl.'s Exhibit F ¶ 21, ECF No. 37-7.) As an initial matter, Mr. Howsare found DCA's cost structure under the original MSA reasonable. (*Id.* ¶17.) In his expert report, he wrote "It should be noted that I believe that the original DCA approach to billing costs in attachment A–D is a reasonable representation of billing cost structures that could be expected in the general telecom market." (*Id.*) He further opined that the "work effort and pay levels for the functional roles are reasonable expectations based on my experience." (*Id.* ¶ 20.)

Mr. Howsare found a differential when examining the contract after the May 2012 First Service Agreement to the MSA. (*Id.* at 51.) Under the amendment, COI agreed to pay DCA a minimum payment of $35,000 per month. Mr. Howsare valued the services provided at $12,000, a $23,000 differential. (*Id.*) Yet, Howsare opined that the differential was reasonable, for similar reasons DCA contends that payments were reasonable. He stated "[i]t is possible that they could have found a person with the necessary skills for less, but I believe that the costs modeled in the supplemental model would be reasonable." (*Id.* at PAGEID #: 50–51.) He further opined, "it is clear that the Chief Operating Officer's role (and in particular Jeff Swenson in that role) was key to entering into the MSA . . . ." (*Id.*)

DCA disputes Thermo Credit's calculations, arguing that a penny-for-penny calculation does not sufficiently reflect what prices are considered reasonable for two main reasons. First, as Seth Block, Thermo Credit's Vice President, testified, there is no industry fee schedule for the services DCA provided COI. (Block Dep. at 224:14–16, ECF No. 34.) Similarly, Block testified that he believes there is a ten to fifteen percent variance in vendor fees in within the industry. (Block Dep. at 224:17–23.) DCA therefore contends that even if COI paid more for DCA's services then the comparative vendor Mr. Howsare utilized, such variance is appropriate.

Second, DCA posits that variance was reasonable in the agreement between DCA and COI because DCA provided indirect benefits. (Def.'s Mot. Summ. J. at 9–10.) At the time DCA took over management for COI, Mr. Swenson testified that COI's most important vendor CenturyLink was ready to stop doing business with COI. (Swenson Dep. Exhibit 15 29:5–7 ("The company revolved around one vendor in particular, and that was a company known as CenturyLink.").) Mr. Swenson testified that COI was greatly in debt to CenturyLink and "CenturyLink was threatening to turn them out, to go to the Public Utilities Commission of Ohio to turn their services off . . . [COI] had enormous disputes with CenturyLink and they needed to resolve them." (Swenson Dep. Exhibit 15 29:9–18.) DCA asserts that due to its negotiations and work with CenturyLink, COI was able to remain in business for an additional two and a half years. (Def.'s Mot. Summ. J. at 10.)

A review of both direct and indirect benefits obtained by COI reveals that COI obtained a reasonably equivalent value from the payments made to DCA. Accordingly, no reasonably jury could find that DCA received fraudulent transfers from COI under Ohio's UFTA. Thus, judgment is **GRANTED** for Defendant.[1]

---

[1] The parties have not briefed the effect of the bankruptcy proceeding and its subsequent effect on these claims, all of which arose before the bankruptcy and would otherwise have been claims

## IV.

For these reasons, Defendants' Motion for Summary Judgment (ECF No. 35) is **GRANTED**, Plaintiff's Motion for Summary Judgment (ECF No. 37) is **DENIED**, Plaintiff's Motion to Amend (ECF No. 30) is **DENIED** as moot, and Plaintiff's Motion to Strike is **DENIED** as moot. The Clerk is **DIRECTED** to enter judgment in this action.

**IT IS SO ORDERED.**

10-17-2017
**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT CHIEF JUDGE**

---

of the debtor COI. This Court's authority is concurrent with that of the Bankruptcy Court. For these reasons, the Court declines to address the issue.